FILED

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA

2014 JAN 31  P 3: 40

DCG&T f/b/o JACK BATTAGLIA/IRA;
JACK BATTAGLIA and DCG&T f/b/o LORI
BATTAGLIA/IRA,

        Plaintiffs,

v.

GLADE M. KNIGHT, MICHAEL S.
WATERS, ROBERT M. WILY, BRUCE H.
MATSON, JAMES C. BARDEN and DOES
1-10,

        Defendants,

    and

APPLE REIT NINE, INC.,

        Nominal Defendant.

**CLASS ACTION AND SHAREHOLDER
DERIVATIVE ACTION**

**VERIFIED COMPLAINT**

3:14cv 67

Plaintiffs as and for their Verified Class Action and Shareholder Derivative Complaint allege the following upon information and belief based upon the investigation of their attorneys and upon their own personal knowledge as to their ownership of the stock of the nominal defendant.

## I.

## NATURE OF THE ACTION

1.    This is a shareholder class action and derivative action asserting claims on behalf of the public common shareholders of Apple REIT Nine ("A-9") ("A-9 Public Shareholders") and on a derivative basis pursuant to FRCP Rule 23.1 on behalf of A-9 for damages threatened

by the close of the impending merger of Apple REIT Seven ("A-7") and Apple REIT Eight ("A-8") with A-9 (the "Merger") on or about February 21, 2014 after the shareholder vote.

2.    The Merger terms require A-9 to issue one share of its own common stock for each share of the common stock of A-7 and to issue .85 of A-9 common share for each share of the common stock of A-8.  Because each share of the A-9 common stock is materially more valuable than the common stock of A-7 or A-8, A-9 is being forced by its conflicted, self-dealing, control persons, (*i.e.* CEO Glade M. Knight and other executive officers) to enter into the Merger.  The net effect will be that (a) A-9 is merging with A-7 and A-8 and overpaying for A-7 and A-8 at the expense of current A-9 holders more than it is worth; (b) defendant Knight is forcing A-9 to grossly overpay him for his A-7 and A-8 preferred shares stockholdings; (c) plaintiffs and all other A-9 Public Shareholders will suffer massive dilution from the Merger; and (d) defendants are undermining A-9's ability to list itself publicly at a very advantageous time, the Merger will delay the listing and the hotel business cycle may peak in the meantime.  In December 2013, Hilton Worldwide Holdings completed a hugely successful, well received initial public offering.

3.    Moreover, because the Proxy materials being provided to A-9 public shareholders are materially false, incomplete and misleading, the A-9 Public Shareholders' right to vote has been materially undermined and therefore any vote to approve the Merger will be invalid and void.  Furthermore, the A-9 Public Shareholders cannot make a determination of whether to seek an appraisal remedy or not because of insufficient information provided by in the Proxy Statement.  Finally, defendants have structured the vote to coerce A-9 Public Shareholders into voting for the Merger and forebear from seeking appraisal by withholding relevant information and by failing to provide adequate time for A-9 Public Shareholders to make a decision.  The 600

2

plus page Proxy was only first mailed on January 23, 2014 and the votes must be cast or

appraisal elected by February 21, 2014. Thus, A-9 Public Shareholders are being afforded less

than one month for this important and complex decision that will forever change A-9.

    4.    Plaintiffs have requested an expedited hearing for the reason that the shareholder

vote is scheduled for February 21, 2014 and if the vote is not enjoined plaintiffs and all other

shareholders of A-9 and A-9 itself will suffer irreparable injury.

## II.

## THE PARTIES

### A. Plaintiffs

    5.    Plaintiffs DCG&T f/b/o Jack Battaglia/IRA; Jack Battaglia and DCG&T f/b/o

Lori Battaglia/IRA are and have been continuously owners of shares of A-9 common stock of

defendant Apple REIT Nine, Inc. (hereinbefore referred to as "A-9"). Plaintiffs, as required

under Virginia Code, made a demand upon the director defendants to address the shareholder

derivative claims referred to herein. Defendants have failed to respond.

    6.    Plaintiffs were sold interests in the Apple Nine REITs at a fixed price of $11 per

share. Until spring 2013, Plaintiffs received regular distributions on their investments equal to

approximately 7% to 8% of their principal investment, on an annualized basis. Unlike the Apple

REITs, most REIT shares are registered for trading on a national securities exchange. Their

share prices will reflect investors and analysts' assessment of their assets and business

operations. The Apple REITs are "non-traded REITs," as their shares are not registered for

trading on any exchange. Investors in non-traded REITs cannot liquidate readily except

through sponsor redemptions whereby A-9 would buy back its shares from investors. Early in

the lift of A-9, it was redeeming shares from the public holders. However, A-9 has been

redeeming less than 5% of shares requested in the last year. As of this spring, A-9 was not even recording the requests for redemption. Thus the "first come-first served" redemption procedure has been abandoned and A-9 has no intention of ever redeeming anymore A-9 shares. The Apple REITs have promised to provide liquidity in 5-7 years through a listing of the shares on a national securities exchange. However because of their poor performance and overleveraged balance sheets, the A-7 and A-8 REITs will be barely marketable. Thus Apple REIT's common management and interlocutory directors are trying to salvage A-7 and A-8 by combining with A-9.

### B. Defendants

7.    Defendant A-9 was formed by defendant Knight in November 2007 and is focused on the ownership and operation of extended stay and limited service hotels and other income producing real estate. A-9 raised $2 billion from the sale of equity between April 25, 2008 and December 2010, when it was closed to new investors. A-9 is a Virginia corporation headquartered in Richmond, Virginia.

8.    Defendant Glade M. Knight is the Chairman and Chief Executive Officer of each of the Apple REITs. He is also the direct or indirect owner of all of the related entities that provide property management, acquisition, advisory, operational and managerial services to the Apple REITs. As the direct or indirect owner of the related Apple REIT entities, Knight has the power to terminate the agreements between the Apple REITs and the related Apple entities without or without cause. At the formation of each Apple REIT (*i.e.* A-7, A-8 and A-9), Knight had each of them allocate hundreds of thousands of shares of A-9 preferred stock to himself for nominal consideration. In the Merger, the Knight dominated A-9 Board of Directors has approved the conversion of Knight's A-9 preferred shares into A-9 common shares

4

even though there is no legal obligations to do so. As a result, once the Merger is consummated, Knight will receive a windfall of tens and tens of millions of dollars.

9.      Defendant Michael S. Waters has been a director of Apple REIT Eight from 2007 to present and Apple REIT Nine from 2008 to present. Waters is a member of Apple REIT Eight and Apple REIT Nine's Audit Committees. Waters also served as a director of Apple Hospitality Five and is currently a director of Apple REIT Six.

10.      Defendant Robert M. Wily has been a director of Apple REIT Eight from 2007 to present and Apple REIT Nine from 2008 to present. Wily is a member of Apple REIT Eight and Nine's Audit, Compensation and Executive Committees. Wily also served as a director of Apple Hospitality Five and is a director of Apple REIT Six.

11.      Defendant James C. Barden is a director of A-9 and has been since 2013. He is also a director of A-7. He is currently a member of the A-9 Executive Committee and A-7 Executive Committee.

12.      Defendant Bruce H. Matson has been a director of A-9 from 2008 to present. Matson serves as Chairperson of A-9's Compensation Committee and is a member of A-9's Executive Committee. Matson was also a director of A-6 and is a director of A-7, and previously served as a director of Apple Hospitality Two and Apple Hospitality Five.

13.      Defendants Glade Knight, James C. Barden, Michael S. Waters, Robert M. Wiley and Bruce H. Matson, are collectively referred to as the "Individual A-9 Defendants."

14.      The A-9's boards of directors have "full, exclusive, and absolute power, control and authority over [the REITs'] property and business." A-9 has publicly represented that "the powers of our company will be exercised by or under the authority of, and the business affairs of our company, will be controlled by, the board of directors." Distributions are at the

discretion of the board members. They also approve transactions with affiliates and related parties, determine the amount of the REIT's aggregate debt, and may reject any request for redemption, change the purchase price for redemptions, or suspend or terminate the redemption program. The boards may recommend a merger or sale of the company, or a listing, liquidation or other transaction.

15.     The named Individual A-9 Defendants are the directors, of Apple REIT Nine, Inc. Because of their positions the named Individual Defendants owed fiduciary duties of care, loyalty and candor to A-9 as well as the common shareholders of A-9.

16.     Defendant DOES 1-10 are officers of A-9 who constitute the "management" group which according to the Proxy, determined to recommend the unfair exchange ratios to A-9 Special Committee and Board which rubber stamped said ratios. The officers were also under a fiduciary obligation to serve A-9 faithfully and not compromise A-9 interest for other Apple REITS or to enhance their own financial position.

17.     Defendant Does 1-10 participated in the improper acts or acted with or in furtherance of them, or aided or assisted in carrying out their purposes as alleged in this complaint, and have performed acts and made statements in furtherance of the violations.

### III.

### JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1337. The Court has subject matter jurisdiction of the state law claims under 28 U.S.C. § 1332(d) because the aggregate amount in controversy exceeds $5,000,000 and at least one class member is a citizen of a state different from a defendant.

6

19.     Venue is proper under Section 28 U.S.C. §§ 1391(a) and (b) because a substantial part of the acts and omissions giving rise to the claims in this action occurred in this District and certain of the defendants have their principal place of business within this District.

## IV.

## CLASS ALLEGATIONS

20.     This action is brought by Plaintiffs, for themselves and on behalf of all others similarly situated, as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2) and b(3). Plaintiffs seek to represent the following proposed class:

> All persons and entities other than defendants, Apple REIT insiders or affiliates that owned beneficial shares in A-9 as of January 5, 2014, the record date of the Merger vote.

21.     Excluded from the class and subclasses are: Defendants and any person, firm, trust, corporation, or other entity related to or affiliated with any of Defendants.

22.     Numerosity. The members of the class are so numerous and dispersed that it would be impracticable to join them individually. There are approximately 38,500 investors in A-9, according to its 2010 10-K. Defendants have said that approximately 24% of investors who hold Apple REIT shares distributed by DLA are New Jersey residents, and that approximately 54% are New York residents. While Plaintiffs do not know the exact number of members of the class and subclasses at this time, Plaintiffs believe there are, at a minimum, hundreds of members of each proposed subclass, and tens of thousands of members of the class. DLA's records contain sufficient information to determine the exact number of persons in the class and in each proposed subclass.

23.    Existence and Predominance of Common Questions.  Common questions of law and fact exist as to all class and subclass members and predominate over questions affecting only individual subclass members.  These common questions include the following:

(a)    Whether the Defendants breached fiduciary duties to Plaintiffs and class members;

(b)    Whether the Does 1-10 aided and abetted the Defendants' breach of fiduciary duty;

(c)    Whether Defendants owed a duty of care to Plaintiffs and class members;

(d)    Whether Defendants breached the duty of care they owed to Plaintiffs and class members;

(e)    Whether Plaintiffs were damaged in their franchise and through dilution of their equity;

(f)    What remedies are appropriate compensation for the damages caused to Plaintiffs and class members; and

(g)    Whether the Plaintiffs and class members are entitled to a reasonable award of attorneys' fees, interest and costs of suit.

24.    Typicality.  Plaintiffs' claims are typical of the claims of the members of the class they represent because they all invested in the A-9.

25.    Adequacy of Representation.  Plaintiffs will adequately represent and protect the interests of the class and subclasses and have no interests that conflict with or are antagonistic to the interests of class members.  Plaintiffs have retained attorneys who are experienced and capable of prosecuting complex litigation.  Plaintiffs' attorneys will actively

8

conduct and be responsible for the prosecution of this litigation, and have adequate resources, experience and commitment to litigate this matter.

26. <u>Superiority</u>. A class action is superior to any other method available for the fair and efficient adjudication of this controversy because it would be impractical and unduly burdensome for each of the individual class members to bring a separate action. Moreover, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

27. Class certification is also appropriate because there is a readily identifiable class and readily identifiable subclasses, on whose behalf this action can be prosecuted. Class members are readily ascertainable from Defendants' records. A notice of pendency or resolution of this class action can be provided to class members by direct mail, email, publication notice, or other similar means.

28. In the alternative, the class and subclasses may be certified under Rule 23(b)(1), 23(b)(2) or 23(c)(4) because:

(a) The prosecution of separate actions by the individual members of the class or Subclasses would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for Defendants;

(b) The prosecution of separate actions by individual class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;

(c)     Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the members of the class as a whole; and

(d)     The claims of class members are comprised of common issues that are appropriate for certification under Rule 23(c)(4).

29.     A class may also be certified under Rule 23(b)(3) because common questions predominate over individual questions and a class action is a superior manner of adjudicating the claims.

## V.

## SHAREHOLDERS DERIVATIVE ALLEGATIONS

30.     As required by Virginia Code, plaintiffs gave the directors of A-9 the first opportunity to act independently and disinterestedly and in the best interests of A-9 to rescind the Proposed Merger or adjust its exchange ratio terms materially in favor of A-9 or institute claims on behalf of the Company against all parties responsible for losses incurred and to be incurred as a result of the Proposed Merger between/among the Company and A-7 and A-8 and remediate the untenable conditions and practices described herein.  Plaintiffs through their counsel sent a detailed demand letter to the Board.  *See* Exhibit A.

31.     Specifically plaintiffs made written demand upon the Board to investigate and take all appropriate legal action against all parties, including any officers, trustees, and/or directors, responsible for the proposed merger of Apple REIT Seven, Apple REIT Eight and Apple REIT Nine.  By this demand we do not concede the independence of the Board or *any* of its past or present members and expressly reserve our right to assert the board members': (1) individual and/or collective self-interests on both sides of the merger transaction approved by the

Board; (2) lack of independence; (3) domination by self-dealing members; and (4) obligation to prove the "entire fairness" of the proposed merger by reason of the Board members' presence on both sides of transactions with A-9 from which they or affiliates will profit at A-9's and/or shareholders' expense.

32.     The company failed to acknowledge the letter or conduct any investigations and took no action by or on behalf of the Board or A-9 on any of the subjects raised in the letter.

33.     The action is not a collusive one to confer jurisdiction on the Court.

34.     In any event, demand would be futile because all of the directors of A-9 are officers and/or directors of either A-7 or A-8 at the same time they are directors of A-9 and each of the A-9 directors has a material financial interest in approving the merger not shared by other A-9 shareholders and are dominated and controlled by defendant Knight. Thus none of the directors of A-9 could objectively consider the demand.

35.     Plaintiffs can fairly and adequately represent the interests of shareholders who are similarly situated in enforcing the rights of A-9.

## VI.

## BACKGROUND

### A. The Apple REITs

36.     A real estate investment trust, or REIT, is an entity that owns and operates income-producing real estate and distributes the income to investors. REITs pool the capital of numerous investors to purchase a portfolio of properties the typical investor might not be able to buy individually. To qualify as a REIT, a company must have most of its assets and income tied to a real estate investment and must distribute at least 90% of its taxable income

to shareholders annually in the form of dividends. To be sustainable, a REIT's dividends should be funded by cash flows from the income-producing properties.

37.     Knight's REITs are referred to as the "Apple REITs," and are numbered Seven through Ten. As each REIT closed to new investors, Knight opened the next one. The offer and sale of securities of each Apple REIT entity was registered with the SEC and each Apple REIT entity is a reporting, non-traded public company. The Apple REIT shares do not trade on any securities exchange and are illiquid. A-7, A-8 and A-9 operate but are closed to new investors. A-10 opened in January 2011 and is still open to new investors.

38.     The Apple REITs all invest primarily in Marriott and Hilton extended stay and limited service hotels. (One exception was Apple REIT Nine's acquisition in 2009 of approximately 417 acres of land in the Fort Worth, Texas area that includes 113 sites leased to a third party for the production of natural gas.)

39.     All of the Apple REITs have the same stated investment objective:

> Our primary business objective is to maximize shareholder value by achieving long-term growth in cash distributions to our shareholders. We intend to pursue this objective by acquiring hotels, residential apartment communities and other income-producing real estate in metropolitan areas throughout the United States for long-term ownership. We generally intend to acquire fee ownership of our properties. We seek to maximize current and long-term net income and the value of our assets. Our policy is to acquire assets where we believe opportunities exist for acceptable investment returns. We expect to pursue our objectives primarily through the direct ownership of hotels, residential apartment communities and other income-producing real estate assets in metropolitan areas throughout the United States.

40.     All of the Apple REIT shares sold for $11 per share (after the first 5% was sold for $10.50). This per share price never changed.

41.     Until May 2011, DLA's monthly customer account statements showed an $11 market price and market value for each of the Apple REITs.  The statements said that the share prices were calculated using several factors, including the then- current value of the assets in each Apple REIT:  "The per share estimated values for the Apple REIT securities are based on information provided by the issuer in the Annual Reports and are developed after considering, where appropriate: the current per share offering price; the per share price utilized in the issuer's dividend reinvestment and share redemption plans; and the value of the issuer's assets."  Beginning in May 2011, the statements have described the shares as "not priced."

42.     Until approximately 2012, and recently, A-7, A-8 and A-9 consistently paid monthly distributions of 7-8% to investors.

43.     Investors in the Apple REITs were encouraged to reinvest their dividends to acquire more Apple REIT shares at $11 per share through a "Dividend Reinvestment Plan" ("DRIP").  Investors may reinvest as much as they want through the DRIP and many of DLA's customers reinvested their distributions.

44.     Investors had limited redemption rights.  After three years from the date of their initial investment, investors were in theory free to redeem their shares for the full $11 paid to acquire them.  If they redeemed earlier, investors would receive only 92% of their principal investment.  But even after the three-year waiting period, redemptions were limited to 3% to 5% of the weighted average number of shares outstanding during the 12-month period immediately prior to the date of redemption.  Thus, if a substantial number of Apple REITs were to seek redemption at or about the same time, only a small fraction would be

eligible. Apple REITs Seven and Eight recently announced plans to reduce their redemptions to 2% later this year.

45.     Defendant Knight reaps the benefits of the Apple REIT's external management structure whereby Knight owned companies provide services to Apple REITs for compensation.

46.     Defendant Knight has earned more than $100 million through ongoing management and transactional fees paid by the Apple REITs to the various entities he controls. He is the sole owner of Apple Suites Realty Group, which provides brokerage services to all of the Apple REITs and receives 2% of the total purchase price of all acquisitions. He is also the sole owner of the Apple advisory companies (A-8 Advisors, A-9 Advisors and A-10 Advisors), which evaluate and recommend property, serve as property investment advisors and supervise day-to-day operations. The advisory fees range from .1% to .25% of investors' capital annually. Knight also indirectly owns Apple Fund Management, which provides staffing to the other Apple entities.

47.     Upon the creation of each of A-7, A-8 and A-9, Knight had each of those Apple REITs sell him preferred stock at a price of 10 cents per share. As a result of the Merger, Knight can now convert each share into A-9 common stock and realize the value of these holdings.

### B. A-9's Governance and Management Structure Is Rife With Irremediable Conflicts

48.     A-9's governance and management structure facilitates, rather than discourages, conflicts of interest among the A-9 Board, Glade Knight, A-9, A-8 and A-7 (including its public shareholders). The Board has been incapable or unwilling to protect A-9 from these conflicts, as demonstrated below.

49.     The conflicts are as obvious as they are inevitable. A-9 business is conducted under the five-member Board and many of its most essential day-to-day operations are

conducted pursuant to fee-based agreements with advisors owned by Mr. Knight. Every officer of A-9 is dominated and controlled by Mr. Knight and every director of A-9 is also a director of other Apple REITS, including A-7 and A-8. Glade M. Knight, James C. Barden, Jr., Kent W. Colton and Bruce Matson serve as A-7 directors. Knight, Burting and Colton are also A-8 directors along with Waters and Wily. Knight, Barden, Matson, Waters and Wily are the directors of A-9. Knight and Colton are also directors of A-10.

50.     Yet, the Board has not even taken the most basic steps to ameliorate conflicts or protect A-9 from the consequences of such conflicts, in general, or with respect to the Proposed Merger. The types of conflict infecting this Board are similar to those denounced by the Court of Chancery in *Kahn v. Portnoy*, No. 3515-CC, 2008 Del. Ch. LEXIS 184, *25-34 (De. Chancery, December 11, 2008).

51.     With respect to the Merger, the conflicts have been exacerbated. Matson and Waters were appointed as the Special Committee of the A-9 board supposedly to provide an independent recommendation to the A-9 board whether the merger of A-7, A-8 and A-9 should proceed. However, A-9 Special Committee director Waters is also a director of A-8. A-9 Special Committee director Matson is also a director of A-7.

52.     The management of the Apple REITS had, and still have, a financial motive to propose and consummate the merger whether it is advantageous to A-9. In the aggregate, executives of A-7, A-8 and A-9 including Glade Knight, Justin Knight, David McKenney, Kristian Gathright, Bryan Perry and David Buckley own Series B convertible preferred shares of A-7, A-8 and A-9 which currently have no stated value, will convert into 20,847,198 A-9 common shares valued at $11 each. Save for the merger there shares would not be converted.

53.     Consolidation or listing on an exchange would be incredibly profitable for Knight, who is issued "Series B" shares at a price of $0.10 per share at the formation of each REIT. He can convert each Series B share into 24.17104 common shares in the event the REIT engages in a transaction like a liquidation, roll up or consolidation, or if the REIT's shares are listed on an exchange.

54.     A-9 has admitted its Board is conflicted. The A-9 Board unanimously approved the Merger Agreement based upon the recommendation of the A-9 Special Committee. Reportedly, the A-9 Board did not make a recommendation to the A-9 common shareholders because, the A-9 Special Committee "determined," because of the "overlap among the directors of Apple Seven, Apple Eight and Apple Nine." This statement constitutes an admission of the conflicts that tainted the entire merger process. Obviously if overlap among board members precluded a fair recommendation to shareholders then it is obvious that overlap among Special Committee members and Board members would also preclude an untainted recommendation to the Board by the Special Committee.

55.     The Special Committee of A-9 was advised by a conflicted investment advisor, Citigroup. Citigroup had previously provided services to A-8 as financial advisors in the proposed 2012 consolidation of A-8, A-7 and A-9. Moreover, Citigroup has a financial incentive for the Merger to close.

C. **Events Leading To The Proposed Merger**

  1. **Background: A-7 And A-8 Shares May Have Lost Close To 60% Of Their Value Prior To The Merger**

56.     Starting in May 2011, DLA changed the estimated market price and estimated market value for Apple REIT shares on its customer account statements from $11 to "not

priced." DLA deleted the explanation of how the share value was calculated from the statements, and gave no explanation for the change to "not priced."

57.     In a June 2, 2011 New York Times article about DLA and the Apple REITs entitled "Statements Skip Over REIT's Woes," Knight was quoted as saying, "Who knows what the value is? I would not be comfortable in saying it was $4, $5, or $6. If I said I could sell it for $12, I would be sued."

58.     In June 2011, Mackenzie, Patterson, Fuller, LP ("MPF"), a company engaged in trading discounted and distressed real estate securities, offered to purchase A-7 and 8 shares for $3 per share and estimated that the liquation value of A-7 was approximately $4.15 per share and A-8 was approximately $4.10 per share. The REITs recommended rejection of the tender offer and stated that, as of March 31, 2011, the A-7 shares had a per unit "book value" of $7.83 and the A-8 shares had a per unit "book value" of $7.57.

59.     On August 19, 2011, Apple REITs Six, Seven, Eight and Nine announced that their boards of directors had authorized the evaluation of a possible consolidation transaction in which the Apple REITs would be combined, possibly with a listing of the stock of the combined enterprise for trading on a national exchange.

60.     In September 2011, MPF made a new tender offer of $5 per share for A-6 and $4 per share for A-7 and A-8, estimating that the liquidation value for A-6 was approximately $6.98 per share, A-7 was approximately $4.88 per share, and A-8 was approximately $4.26 per share. Defendants again recommended rejection of the offer and stated that as of June 30, 2011, the per unit book value of A-6 shares was $7.73, Apple REIT Seven shares was $7.71, and A-8 shares was $7.42.

## 2. The Merger Process Was Unfair And Resulted In An Unfair Transaction For A-9

61.     The entire process leading to a signed merger agreement was the product of a course of fiduciary breaches that has put A-9 shareholders at risk of (i) dilution; (ii) overleveraging; (iii) jeopardizing the opportunity for maximizing the value of an IPO/public listing of A-9 to the current holders of A-9; and (iv) limiting liquidity and distributions in the future.

62.     First of all because a sale or other disposition of A-9 has always been a possible candidate for sale to an acquiror.  Accordingly under standard director fiduciary law, A-9 directors were under a duty to maximize A-9 shareholder value through any means.  The A-9 directors were of course duty bound to take all reasonable steps to elicit the highest offer possible for A-9.

63.     The stunted and inadequate procedures employed in this instance to allegedly facilitate a "liquidity event" stand in stark contrast to the procedures employed by Apple REIT management when it decided to pursue a "liquidity event" for Apple Six REIT through a sale. There the Apple Six board ordered the financial advisor to solicit interest from third parties.  The financial advisor identified approximately 130 prospective buyers.  Thirty six if those prospective buyers signed confidentiality agreement.  Eventually a sale of A-6 was agreed in 2013 to a Blackstone Group affiliate.

64.     The conflicted process of determining the exchange ratio began when the A-9 Board allowed unidentified persons referred to only as "management of the Apple REITS" to propose the merger consideration for the merger.  Later, the Proxy states, that [unidentified persons referred to only as . . .]" Executive officers of the Apple REITS formulated the proposed merger consideration by utilizing a discounted cash flow analysis and capitalization rate analysis

of each the Apple REITS and proposed the exchange ratios of the merger to reflect the "appropriate midpoint of the relevant ranges." However, despite the fact that DLA had always up to 2011 reported the value of A-9 shares based on *inter alia* "asset values" the A-9 directors refused to have any of the Apple REIT's assets appraised for the Merger.

65.     The A-9 Special Committee was operating under faulty views of their fiduciary duties when they rejected the opportunity to have third party appraisals of A-7 and A-8 properties because it was "not necessary."

66.     Defendants were and are under a duty to maximize the value received for the A-9 shareholders because it has always been the intent of A-9 to explore and as advantageous engage in a sale, liquidation or merger of A-9 thus imposing upon the A-9 directors "Revlon" duties to maximize A-9 shareholder value not merely to engage in transformative transactions which are "fair" to A-9 stockholders "from a financial point of view."

67.     The financial condition and results of operations of A-7 and A-8 as compared to A-9 in no way justify the exchange ratios rubber-stamped by the Board after being proposed by interlocking officers of A-7; A-8 and A-9. The unfairness of the exchange ratio is blatantly obvious and egregious.  A-9 is being valued equally to A-7 and near equal to A-8.

68.     The recently issued three month and nine month reports of operations for A-7, A-8 and A-9 serve only to highlight the value-disparity of the merger exchange ratio. The unfairness of the ratio is reflected by:

(a)     A-9 is the least leveraged with only $1.26/share in liabilities compared to A-7's $2.46/share and $3.38/share.

     (b)    A-9's nine month REVPAR growth year over year was 6%; for A-8 it was 3.4% and for A-7 it was 4.6%. Clearly, A-9 is exhibiting higher growth potential. That growth potential is not reflected in the exchange ratio.

     (c)    The EPS for the nine months ended September 30, 2013 was $.09 for A-7 and $.04 for A-8. For A-9 it was $.10/share which is higher than A-7 and 2 ½ times higher than A-8.

     (d)    A-9's per share shareholder's equity is $7.09/share; while A-8's is only $6.33/share and A-7 is $6.58/share. That equity advantage is not reflected in the exchange ratio.

69.    It has been proven historically that low-leverage REITs have the best long-term performance. Moreover, a low-leverage REIT like A-9 will receive a higher value in the public markets rather than a higher leveraged consolidated post-merger company. Thus, the A-9's board's failure to consider the alternative of a stand-alone initial public listing on any other value maximizing alternatives was a breach of their duty of care and left them uninformed to make the decision to enter into the Merger Agreement, thus depriving the Board of the protections of the business judgment rule.

70.    A-9 has a superior portfolio of hotels than either A-7 or A-8. A-9 has 89 hotels with 11,371 rooms in 27 states while A-7 has 51 hotels with 6426 rooms in 18 states and A-8 has 51 hotels with 5914 in 19 states.

### D. The Board's Breach Of Fiduciary Duties

71.    Instead of Apple REIT's conflicted management, persons, singularly (and without conflict), dedicated to the best interests of A-9 and its shareholders should have been put in charge of negotiations for the merger consideration. The so-called A-9 "Special Committee" of Matson and Waters is similarly conflict-ridden inasmuch as Matson and Waters are concurrently

20

directors of A-7 and A-8. While they purport to serve the best interests of A-9 and its shareholders, directors of A-9 who hold concurrent directorships with either A-7 or A-8 cannot be "independent" because the merger is a zero-sum game among the merger participants. Accordingly, any benefits accruing to A-7 or A-8 comes at the expense of A-9 and its shareholders. That conflict cannot be ignored, muted or waived, it must be eliminated. Any agreement resulting from such a conflict ridden process must be rescinded.

72. Under Virginia law as under Delaware law, given the factual circumstances present here, A-9's directors were required to maximize A-9 holder's value, not merely obtain for them a "fair" deal.

73. The Apple REIT Nine directors have breached their fiduciary duties of care and loyalty to the shareholders and to A-9 by the following acts and/or omissions:

(a) Failing to have an appraisal of all the properties of A-7, A-8 and A-9.

(b) Failing to utilize current appraisals of the properties owned/operated by A-7, A-8 and A-9 to formulate an exchange ratio that would maximize value for A-9 shareholders.

(c) Failing to ascertain whether any value maximizing alternatives to the proposed merger were viable for A-9.

(d) Failing to constitute a Special Committee of directors with no affiliation, business or social relationship with any of the other Apple REITs or Glade Knight or the Advisors.

(e) Failing to allow a true Special Committee of independent unaffiliated directors to negotiate and agree to a proposed exchange ratio for a merger with A-7 and/or A-8 in the event it was determined that a merger with A-7 and/or A-8 was the most value maximizing alternative available to A-9 now or in the near term.

(f)      Failing to allow independent directors to direct financial advisors and/or investment bankers to explore or evaluate other strategic alternatives for A-9.

(g)      Failing to solicit expressions of interest from third parties for acquisition of, or merger with, A-9 prior to execution of the Merger Agreement.

(h)      Failing to conduct a fair and open auction for A-9.

(i)      Failing to eliminate conflicts of interest between/among parties to the initial negotiations and the merger parties' management leading to the settling of the exchange ratio.

74.      The Board should have but failed to:

(a)      Withdraw from the Apple REIT Nine agreement to merge with Apple REIT Seven and Apple REIT Eight.

(b)      Appoint a lead independent director with no current or recent financial or professional affiliation with any of the Apple REITs, David Lerner Associates, any officer or director of any of the Apple REITs or any of the companies/entities owed/controlled by Glade M. Knight.

(c)      Identify, analyze and eliminate all conflicts between and among Apple REIT Nine and its managers, directors and service providers.

(d)      Empower, by Board resolution, a lead independent director to hire financial, legal and other advisors as reasonably necessary to ascertain a value-maximizing path for Apple REIT Nine and its current common shareholders.

(e)      Explore all value maximizing alternatives for Apple REIT Nine, including an initial public offering on a stand-alone basis with other entities.

      (f)     Adjust the exchange ratios in the current proposed merger to reflect actual relative values of the merger parties' common shares.

      (g)     Adjust the exchange ratio of Class B preferred shares and/or rescind their conversion to common shares.

75.     The foregoing instances of fiduciary breach have resulted in the execution by A-9 of a Merger Agreement which unfairly values A-9 and appropriates A-9 value for the shareholders of A-7 and A-8 and Knight at the expense of A-9 shareholders. A-9 has suffered and will continue to suffer damage and loss, as will its shareholders.

76.     Upon completion of the merger, A-9 will have issued an additional 179,664,580 shares of common stock, nearly doubling the amount of shares outstanding and will have suffered massive dilution. After the merger A-9 shareholders will hold less than a majority (49%) of the A-9 equity.

### E.  The Merger Provides A Financial Windfall To Insiders

77.     Each Series B preferred convertible shares of A-7, A-8 and A-9 will be converted to 24.1704 shares of A-9 common stock. The Apple Senior Series B convertible preferred shares were acquired for 10 cents per each of the 240,000 awarded to defendant Knight. He similarly received 240,000 shares of the Series B convert preferred for A-8 and 480,000 A-9 shares for 10 cents each.

78.     The value of these converted shares to Glade is $48 million (book value) for his A-7 B shares; A-8, $41 million and $96 million for A-9.

79.     The merger will also endow A-7 and A-8 shareholders with windfall distributions of approximately $.62 to $.72 per share at the expense of current A-9 shareholders' distribution

which for the year ended December 31, 2012 and the annualized period ending September 30, 2013 is higher than the anticipated dividend distribution range.

### F. The Proxy Statement Is Materially False And Misleading

80.     The Proxy fails to provide and/or misrepresents material information to A-9 shareholders relevant to their decision to: (a) vote on the proposed merger and other proposals; and/or (b) to seek appraisal.

81.     The Proxy Prospectus nowhere reveals the underlying discounted cash flow and cap rate analysis or the underlying variables used in making the calculations such as cost of A-9 equity, cost of A-9 debt; weighted average cost of capital, or capital asset pricing model variables. Moreover, it is nowhere disclosed what was the basis for choosing between the "Free Cash Flow To Equity" DCF analysis or "Discounted Divided Method" DCF analysis. Nor are the "ranges" disclosed and the "approximate" midpoint is not disclosed. Moreover, the integrity, accuracy or utility of the forecasts is not revealed to shareholders except that the forecasts "do not comply with guidelines established by the AICPA or published guidelines of the SEC or GAAP. The Proxy itself admits that the financial metrics used "do not provide a complete picture of the operations of the Apple REITs."

82.     Furthermore, A-9 shareholders cannot evaluate or even understand the Cap Rate analysis because there are no current properly asset values because A-9's Board refused to have the Apple REIT's properties appraised. Since the cap rate calculation depends on "property asset value," if such values are not available on a current basis the cap rate analysis will have no integrity or usefulness.

83.     The Proxy fails to disclose the valuation process leading to the exchange ratio and specifically:

24

It fails to disclose how the exchange ratios took "into account the fact that A-9 paid a special distribution or Series A preferred of .75 per share in May 2012, while neither A-7 nor A-8 ever paid any special dividends.

84.    Among the other omitted and/or misrepresented material facts, which should be addressed if the merger is not rescinded:

1.  Misleadingly describing the Special Committee as being composed of "independent" directors.

2.  Failing to adequately disclose conflicts of interest of the A-9 Special Committee members.

3.  Failing to disclose the conflict of interests between/among the parties who determined the merger ratio.

4.  Failure to disclose the identity roles of the persons who negotiated and determined the merger ratios which A-9's board approved.

5.  Failing to disclose all material information regarding the present and former relationships and engagements between A-9 and its initial advisers and A-7 and A-9 financial advisors.

85.    The rationale for a .85 and 1 exchange ratio when the financial comparison ratio used in the analysis will indicate that the exchange ratio of A-9 shares for A-7/A-8 unfairly favors A-7/A-8 holders at the expense of A-9 holders.

86.    Nondisclosures in the Proxy prevent shareholders from evaluating the merger ratios because the forecasts are not compared to the full year results for 2013 or the nine months ended September 30, 2013 or any other financial periods.

87.    No appraisals or valuations of the assets and liabilities of the Apple REITs were obtained in connection with the merger nor were the latest appraisals disclosed.

## COUNT I

### INJUNCTIVE RELIEF

88.     Plaintiffs reallege paragraphs 1 through 87 of their Complaint as if fully set forth herein.

89.     This Court should order A-9 to cancel the shareholder vote on the merger and/or enjoin the merger.

## COUNT II

### (Breach Of Fiduciary Duty Against The Individual Defendants On Behalf Of Plaintiffs And The Class)

90.     Plaintiffs repeat and re-allege the preceding allegations as if fully set forth herein.

91.     Specifically, the Individual Defendants were charged with a duty of due care, to act rationally, in good faith and to inform themselves of all material information reasonably available to them in making decisions on behalf of the Company.  The Individual Defendants were further charged with the duty of loyalty, to act in the best interest of the Company, to avoid self-interested transactions in which the Individual Defendants' interests would be placed above the interest of the Company and its shareholders, and, when seeking shareholder approval of a corporate action, to fully and fairly disclose all material facts to shareholders concerning the action for which such approval was sought.

92.     Further, where the interest of the common stockholders of the Company diverged from those of the preferred shareholders, and the shareholders of A-7 and A-9 the Individual Defendants were charged with a duty to prefer the interests of the common stock – as the good faith judgment of the Board sees them to be – to the interest created by the special rights and preferences of the preferred stock.  At all times alleged, Plaintiff reposed special trust and

26

confidence in the Individual Defendants in that said Defendants controlled and dominated the management and affairs of the Company. At all times alleged, a majority of the Individual Defendants were either interested or lacked independence in determining whether to approve the Merger discussed above.

93.    The Individual Defendants approved a highly dilutive merger which damaged plaintiffs and the Class and approved conversion of insider shares to A-9 common shares which further diluted the plaintiffs and the class. The relative ownership of the potential bidding group fell by from approximately 9.75% to approximately 8.5%.

94.    Moreover, the Merger was accomplished at unfair rates, giving A-7, A-8 shareholders and the individual defendants and additional windfall at the expense of the remaining shareholders.

95.    In approving the Proposed Transaction, the Individual Defendants have not taken adequate steps to protect the interests of the Company's public shareholders.

96.    The unfairness of the terms of the Proposed Transaction is compounded by the gross disparity between the knowledge and information possessed by defendants by virtue of their positions of control of A-7, A-8 and A-9 and that possessed by the Company's public shareholders.

97.    Under the circumstances alleged herein, the Individual Defendants are obligated to explore all alternatives to maximize shareholder value. To accomplish this obligation, the Individual Defendants had a duty to:

(a)    Fully inform themselves of A-9 market value before taking, or agreeing to refrain from taking, action;

     (b)    Act in the interests of the Company's equity owners and not favor the interests of anyone of the others;

     (c)    Maximize shareholder value;

     (d)    Obtain the best financial and other terms when the Company's independent existence will be materially altered by the transaction; and

     (e)    Act in accordance with the fundamental duties of loyalty, care, and good faith.

98.    Because of their respective positions with the Company, the Individual Defendants are also required to:

     (a)    Act independently to ensure that the best interest of the corporation and its shareholders takes precedence over any other interest; and

     (b)    Ensure that if there are conflicts of interest between the defendants' interests and their fiduciary obligations of loyalty, they are resolved in the best interest of the A-9 shareholders.

99.    Because of their conduct as detailed herein" the Individual Defendants are breaching their fiduciary duties owed to the public shareholders of A-9 and are engaging in, or facilitating the accomplishment of, an unfair and coercive transaction in violation of their fiduciary duties to the public shareholders of A-9.

100.    Plaintiffs and the Class will suffer irreparable harm unless defendants are enjoined from breaching their fiduciary duties and carrying out the merger.

101.    Plaintiffs and the Class have no adequate remedy at law.

## COUNT III

**(Breach Of Duty Of Loyalty And Self-Dealing Against Individual Defendants
As A Shareholder Derivative Claim On Behalf Of The Nominal Defendant)**

102.   Plaintiffs repeat and reallege each and every allegation contained herein as if fully set forth herein.

103.   Defendants through their dominance of A-9 caused A-9 to enter into the merger.

104.   The merger was not an arms- length transaction.

105.   The merger is contrary to A-9's best interests for the reasons set forth herein and caused loss and damage to A-9.

106.   The merger constitutes self-dealing by the Defendants named in this count because the Defendants were on both sides of the negotiating table and controlled both sides.

107.   The self-dealing merger implicated the entire fairness standard which thus requires Defendants to establish "fair price" and the product of "fair dealing" in connection with the spin-off and related transactions.

108.   The merger did not occur at a "fair price" for A-9 and was not executed through fair dealing inasmuch as there was no truly independent special committee of A-9 directors nor were alternatives analyzed or considered.  Moreover, the transactions were timed, initiated, negotiated and structured to unfairly benefit the Defendants.

109.   Accordingly, the Defendants named herein breached their fiduciary duties and have damaged the Company.

## COUNT IV

**(Breach Of Fiduciary Duty Of Loyalty And Candor Against All Defendants For Issuing Materially False And Misleading Proxy Statements On Behalf Of Plaintiffs And The Class)**

110.   Plaintiffs repeat and reallege each and every allegation contained herein as if fully set forth herein.

111.   Defendants knowingly caused A-9 to issue false and misleading proxy statements.

112.   As a result of such knowing breach of duty of candor, Defendants caused A-9 to issue a false proxy statement.

113.   As a result, plaintiffs and the Class have had their fiduciary rights damaged and undermined.  If the Merger is approved it will have been as a result of a false and misleading proxy and the void should be voided and the Merger enjoined.

WHEREFORE, plaintiffs pray for judgment and relief as follows:

A.   Ordering that this action may be maintained as a class action and certifying plaintiff as the Class representative;

B.   Preliminarily and permanently enjoining defendants and all persons acting in concert with them, from proceeding with, consummating, or closing the Merger;

C.   In the event defendants consummate the Merger, rescinding it and setting it aside or awarding damages to plaintiff and the Class or the Company;

D.   Directing defendants to account to plaintiffs and the Class for their damages sustained because of the wrongs complained of herein;

E.   Awarding plaintiffs the costs of this action, including reasonable allowance for plaintiffs' attorneys' and experts' fees; and

F.    Granting such other and further relief as this Court may deem just and proper.

Dated: January 31, 2014

SANDS ANDERSON PC

By:_____/s/_____

Jeffrey Hamilton Geiger
SANDS ANDERSON PC
1111 East Main Street, Suite 2400
Richmond, Virginia 23219
Tel: (804) 783-7248
Fax: (804) 783-7291
E-Mail: jgeiger@sandsanderson.com
*Counsel for Plaintiffs*

Lee Squitieri (To Be Admitted *Pro Hac Vice*)
SQUITIERI & FEARON, LLP
32 East 57th Street, 12th Floor
New York, New York 10022
Tel: (212) 421-6492
Fax: (212) 421-6553
E-Mail: lee@sfclasslaw.com
*Counsel for Plaintiffs*

Daniel R. Lapinski (To Be Admitted *Pro Hac Vice*)
WILENTZ, GOLDMAN & SPITZER P.A.
90 Woodbridge Center Drive
Woodbridge, New Jersey 07095
Tel: (732) 855-6066
Fax: (732) 726-4735
E-Mail: dlapinski@wilentz.com
*Counsel for Plaintiffs*

## **VERIFICATION**

I, Jack Battaglia, as trustee of the DCG&T IRA f/b/o Jack Battaglia/IRA and on my own behalf, declare under penalty of perjury say:

I am a trustee of the within action. I have read the foregoing Verified Complaint and know the contents thereof; the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true. The trustee has been a shareholder of the defendant Apple REIT Nine, Inc. for the entire period in question in this suit.

_Jack Battaglia_
Jack Battaglia, Trustee

## VERIFICATION

I, Lori Battaglia, as trustee of the DCG&T IRA f/b/o Lori Battaglia/IRA, declare under penalty of perjury say:

I am a trustee of the within action. I have read the foregoing Verified Complaint and know the contents thereof; the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true. The trustee has been a shareholder of the defendant Apple REIT Nine, Inc. for the entire period in question in this suit.

Lori Battaglia, Trustee