## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

**Richmond Division**

DCG&T, for the use and benefit of
JACK BATTAGLIA/IRA, *et al.*,

        Plaintiffs,

v.

GLADE M. KNIGHT, *et al.*,

        Defendants.

Civil Case No. 3:14-cv-067-JAG

## MEMORANDUM OPINION

Three Virginia corporations that shared overlapping directors and managers merged into one corporation in March 2014. The shareholders of one of those corporations brought this suit against its directors and managers, complaining that the merger was the result of a flawed, conflicted, and ill-considered decision-making process and that the merger diluted the value of their shares. The shareholders ask the Court to find that the directors and managers breached their fiduciary duties to the corporation and shareholders and to undo the merger. The directors and managers filed this motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

In their amended complaint, the plaintiffs (collectively, "DCG&T") allege several putative class and derivative claims arising from the merger of three Richmond-based real estate investment trusts ("REITs"): Apple REIT Nine, Inc. ("A9"), Apple REIT Eight, Inc. ("A8"), and Apple REIT Seven, Inc. ("A7"). After shareholder approval from each entity, A8 and A7 merged

into A9.[1]  DCG&T, which held shares of A9 at the time of the merger, alleges that A9's directors and officers violated Virginia corporate law when they breached their fiduciary duties to the company, engaged in a conflicted or affiliated transaction, and distributed proxy materials that contained material omissions or falsehoods.

DCG&T brings four counts, asserting both putative class and derivative claims and seeking both money damages and rescission of the merger.  Count I alleges a direct class claim against the A9 Directors for breaches of the duty of loyalty and care.  Count II alleges the same breach as a derivative action on behalf of A9 against the Directors.  Count III alleges a direct class claim against the A9 Directors and Managers for breaches of the duty of loyalty and candor.  Finally, Count IV alleges both direct and derivative claims in an effort to undo the merger as a violation of Virginia corporate law forbidding conflicted and affiliated transactions.

Counts I and III fail because Virginia requires that claims for fiduciary breaches be brought as derivative claims, not direct claims.  Count II states a plausible claim for fiduciary breach.  The Directors' arguments that they are immune from liability by virtue of the statutory business judgment rule and A9's articles of incorporation cannot defeat DCG&T's claims at this stage.  Count IV states a derivative claim for a conflicted transaction, but only that.  The amended complaint lacks sufficient facts to support the allegation of an affiliated transaction. Additionally, a plaintiff must bring a conflicted transaction claim as a derivative claim, not a direct claim.  Accordingly, the Court grants the motion with respect to Count I, Count III, and Count IV's affiliated transaction and direct conflicted transaction claims.  The Court denies the motion with respect to Count II and Count IV's derivative conflicted transaction claim.

---

[1] After the merger, A9 changed its name to Apple Hospitality REIT, Inc.  For clarity's sake, the Court will refer to the Apple REITs by their pre-merger names.  Similarly, references to A9's directors and managers refer to the individuals who directed and managed A9 before the merger.

# I. <u>MATERIAL FACTS</u>

REITs are business entities that invest shareholders' money in the purchase and operation of revenue-generating properties. A9 was one of several REITs operated by defendant Glade Knight, who acted as CEO and Chairman of A9, A8, and A7, collectively known as the Apple REITs. Glade Knight also owns, either directly or indirectly, the companies hired by the Apple REITs to provide management, operation, and advice for the Apple REITs' properties. Prior to the merger, defendants Justin Knight, David McKenney, Kristian Gathright, and Bryan Perry comprised the executive management of the Apple REITs, including A9 (collectively, "the Managers"). This consolidation of manpower bled into the Apple REITs' director structures, too: before the merger each director sat on multiple Apple REIT boards. As relevant here, each of the A9 directors, defendants Michael Waters, Robert Wily, James Barden, Bruce Matson, and Glade Knight (collectively, "the Directors" or "the Board"), were directors of either A8 or A7, or, in Knight's case, both; Knight, Waters, and Matson also sat on A7's board, and Knight, Wily, and Barden also sat on A8's board.

As early as 2011, the boards of the Apple REITs each began exploring consolidation into a single REIT. By mid-2013, A7, A8, and A9 each met with legal counsel and financial advisers to coordinate a proposed merger. Because each Apple REIT had directors who served as a director of one of the others, the boards created non-overlapping special committees consisting of two directors. A9's Special Committee consisted of Matson and Waters. Each Apple REIT also hired separate legal counsel and financial advisors to advise on the merger. A9 hired Hogan Lovells and Citigroup, respectively. After Hogan Lovells reviewed the proposed merger agreement and Citigroup determined that the merger terms would be fair to A9, the Special Committee recommended that the Board approve the proposed merger. The proposed terms

3

established an exchange ratio whereby A7 shareholders' shares would be converted to A9 common shares on a 1:1 ratio and A8 shareholders' shares would be converted to A9 common shares on a 1:0.85 ratio.[2]

On August 6, 2013, the Board approved the transaction, and forwarded it for shareholder approval. Because of the overlap among Apple REIT directors, the Board made no formal recommendation to its shareholders with respect to the merger, except to state that the Board found the transaction advisable and in A9's best interests.

The A9 mailed a 600-page proxy statement to shareholders on or about January 23, 2014, and followed that with a supplement on February 19, 2014. When voting closed on February 27, 2014, the requisite number of shareholders from each Apple REIT voted in favor of the merger, which became effective on March 1, 2014. A7 and A8 became wholly owned subsidiaries of A9. A9 then changed its name to Apple Hospitality.

Before the merger, on December 16, 2013, A9 shareholders DCG&T and Jack Battaglia (collectively, "DCG&T") made written demand on the Board to abort the merger or adjust the exchange ratios to be more favorable to A9. The Board did not respond. DCG&T filed its first complaint on January 31, 2014, and sought a temporary restraining order and preliminary injunction to enjoin the merger on February 10, 2014. DCG&T withdrew that request on February 18, 2014, and subsequently filed its amended complaint on March 24, 2014.

The amended complaint alleges claims against the director defendants, the management defendants, ten unnamed individuals, and A9. This matter was reassigned to the undersigned on August 8, 2014.

---

[2] That is, in exchange for one A8 share, a shareholder would receive 0.85 A9 common shares.

## II. DISCUSSION[3]

DCG&T brings four counts against the defendants, each alleging state law claims.[4] Count I alleges a class claim against the Directors for breach of the fiduciary duties of loyalty and care. Count II alleges a derivative claim on behalf of A9 for the same breach. Count III alleges a class claim against both the Directors and Managers for breach of the fiduciary duties of loyalty and candor. Count IV alleges both a class claim and derivative claim in order to set aside the merger as a conflicted or affiliated transaction.

### 1. Counts I and III Must Be Brought as Derivative Actions

A shareholder derivative suit is an equitable action that deputizes shareholders to protect themselves "from the designing schemes and wiles of insiders who are willing to betray their company's interests in order to enrich themselves." *Simmons v. Miller*, 261 Va. 561, 573, 544 S.E.2d 666, 674 (2001) (quoting *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 371 (1966)). Virginia follows the majority rule that "suits for breach of fiduciary duty against officers and directors must be brought derivatively on behalf of the corporation and not as individual shareholder claims." *Id.* at 576, 544 S.E.2d at 675. Virginia limits fiduciary breach claims to derivative actions, in part, because the limitation prevents a deluge of lawsuits, reassures

---

[3] A Rule 12(b)(6) motion to dismiss gauges the sufficiency of a complaint without resolving any factual discrepancies, testing the merits of the claim or judging the applicability of any defenses raised by the non-moving party. *Republican Party of N.C. v. Martin*, 960 F.2d 943, 952 (4th Cir. 1992). A 12(b)(6) motion considers whether the non-moving party's description of the facts, if assumed to be completely true, would entitle her to the requested relief. *Unus v. Kane*, 565 F.3d 103, 115 (4th Cir. 2009). To survive a 12(b)(6) motion to dismiss, a complaint must state facts that, when accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).
[4] The parties do not dispute that Virginia law governs these claims. *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983) ("As a general matter, the law of the state of incorporation normally determines issues relating to the internal affairs of a corporation.").

corporate creditors that damages recovered from the action will be returned to corporate coffers, ensures that all shareholders benefit equally, yet still "compensates the injured shareholder by increasing the value of his shares." *Id.* at 574, 544 S.E.2d at 674. A class action differs significantly from a derivative suit, because a class action asserts a direct claim on behalf of class members who have suffered harm, not on behalf of the corporation.

DCG&T argues that shareholders may pursue direct actions for breaches of fiduciary duty when the shareholders allege "individual injuries, rather than injuries to the corporate entity." Pls.' Supp. Brief 5. DCG&T correctly notes that the Supreme Court of Virginia characterized the derivative-claim rule in *Simmons* as follows: "an action *for injuries to a corporation* cannot be maintained by a shareholder on an individual basis and must be brought derivatively." *Simmons*, 261 Va. at 574, 544 S.E.2d at 674 (emphasis added). According to DCG&T's reading of this language, the use of the phrase "for injuries to a corporation" means that if a director injured the shareholder individually rather than indirectly through the corporation, a shareholder may bring a direct action.

But *Simmons* means something entirely from the language DCG&T cherrypicks from the opinion. In *Simmons*, the Court explained that Virginia strictly adheres "to the rule requiring that suits for breach of fiduciary duty against officers and directors *must* be brought derivatively on behalf of the corporation and *not* as individual shareholder claims." *Id.* at 576, 544 S.E.2d at 675 (emphasis added). The holding in *Simmons* made no distinction between injuries to the corporation and injuries to the shareholder. Eight years later, the Supreme Court of Virginia summarized *Simmons* as meaning "corporate shareholders *cannot* bring individual direct suits against officers or directors for breach of fiduciary duty, but instead shareholders must seek their remedy derivatively on behalf of the corporation." *Remora Investments, LLC v. Orr*, 277 Va.

316, 323, 673 S.E.2d 845, 848 (2009) (emphasis added). In *Remora*, the Court rejected the "contention that [the Court had] previously approved direct causes of action by individual shareholders against directors." *Id.*

This position makes sense viewed alongside the nature of corporate directors' fiduciary duties in Virginia. In *Remora*, the Supreme Court of Virginia approvingly quoted this Court's interpretation of the duty owed by directors to shareholders under Virginia corporate law:

> the Virginia common law duty owed to the shareholders . . . by its directors was not a fiduciary duty inuring to each shareholder in his individual dealings with the corporation, but was rather a duty attaching only to dealings between the officers and directors of the corporation and *the shareholders as a class.*

*Id.* at 322-23, 673 S.E.2d at 848 (quoting *Am. Gen. Ins. Co. v. Equitable Gen. Corp.*, 493 F. Supp. 721, 741 (E.D. Va. 1980)) (emphasis added) (alterations omitted). Thus, *Remora* reinforced the position that corporate directors owe a fiduciary duty "to shareholders as a class and not individually." *Id.* at 323, 673 S.E.2d at 848. It makes sense, then, that because directors act as fiduciaries to shareholders as a group rather than as individuals, Virginia limits claims of fiduciary breach to derivative actions rather than allowing shareholders to assert the breach as an individual injury in direct actions.

If DCG&T were right about the availability of a direct cause of action to a shareholder for a director's fiduciary breach, this Court would have to ignore policies that drive derivative claims. For example, the use of derivative claims prevents the "multiplicity of lawsuits." *Simmons*, 261 Va. at 576, 544 S.E.2d at 675. Allowing direct claims would inevitably lead to multiple claims by various shareholders for the same breach, possibly with inconsistent results. Similarly, derivative claims allow all shareholders to recover equally by rewarding damages to the corporation, which in turn increases the value of shareholders' stock. *Id.* Allowing direct claims would set off a race to the courthouse between shareholders, with each vying to recover

damages before the corporate well runs dry. To prevent these problems, Virginia corporate law funnels fiduciary claims into derivative actions rather than allowing shareholders to sue directly.[5]

DCG&T urges the Court to look to Delaware law to distinguish derivative from direct claims and find their direct claims properly asserted. But the only Virginia case DCG&T cites that supports the application of Delaware law was decided before the Supreme Court of Virginia emphasized the derivative-claim rule in *Remora*. *See Parsch v. Massey*, 72 Va. Cir. 121 (2006).[6] And although the Supreme Court discussed the Delaware test for distinguishing derivative claims from direct claims in *Remora*, the Court explicitly declined to adopt Delaware's framework. *Remora*, 277 Va. at 324, 673 S.E.2d at 848.

This Court will not impose a test declined by the Supreme Court of Virginia. Ultimately, whether the corporation or the shareholder sustained the injury, a breach of fiduciary duty by a director can be redressed only through a derivative action. *See, e.g., Firestone v. Wiley*, 485 F. Supp. 2d 694, 702-03 (E.D. Va. 2007) (dismissing direct claims for breaches of fiduciary duty that allegedly caused individual injuries because those claims must be brought derivatively under Virginia law).

---

[5] The fact that DCG&T brings its direct claims as a class does not save them, but instead further reinforces the rule that shareholders' claims for breach of fiduciary duty must be brought derivatively. Virginia does not recognize class actions. *See Casey v. Merck & Co., Inc.*, 283 Va. 411, 418, 722 S.E.2d 842, 846 (2012). Accordingly, the only manner in which Virginia shareholders may assert their rights as a class is through a derivative action.

[6] DCG&T also cites a footnote in a Fourth Circuit opinion that gives some support to their argument regarding shareholder injuries versus corporate injuries. *See Schupp v. Jump! Info. Tech., Inc.*, 65 F. App'x 450, 450 n.4 (4th Cir. 2003) ("This case is not controlled by *Simmons*, which rejects the proposition that a shareholder can bring individual action *on behalf of the corporation*, rather than a derivative suit, for breach of fiduciary duties by a director. Schupp's claims are based on alleged individual injuries, not injuries to Jump! as a corporate entity."). But *Schupp* predates *Remora*, and *Remora* made no distinction between individual versus corporate injuries in declaring derivative actions the only vehicle for claims of fiduciary breach.

Because Counts I and III assert direct claims for breaches of fiduciary duty, and those actions may be pursued only as derivative claims, the Court GRANTS the motion to dismiss with respect to those counts.

## 2. Count II States a Claim for Breach of Fiduciary Duty

In Count II, DCG&T asserts the same allegations as Count I, but raises them in a derivative claim against the Directors[7] on behalf of A9. DCG&T alleges that the Directors breached their fiduciary duties to shareholders and A9 by engaging in a flawed planning process and approving a merger that harmed A9. DCG&T states sufficient facts to plausibly conclude that the Directors breached their fiduciary duties. Accordingly, the Court denies the defendants' motion to dismiss with respect to Count II.

To state a claim for breach of a fiduciary duty, a plaintiff must establish three elements: (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) subsequent damages attributable to the breach. *See Carstensen v. Chrisland Corp.*, 247 Va. 433, 443-44, 442 S.E.2d 660, 666 (1994). DCG&T's amended complaint establishes each of these three elements.

In Virginia, "[c]orporate officers and directors have a fiduciary duty in their dealings with shareholders and must exercise good faith in such dealings." *Glass v. Glass*, 228 Va. 39, 47, 321 S.E.2d 69, 74 (1984) (citing *Adelman v. Conotti Corp.*, 215 Va. 782, 790, 213 S.E.2d 774, 779 (1975)). This duty mirrors the "duty of fidelity which arises in dealings between a trustee and a beneficiary of the trust." *Adelman*, 215 Va. at 790, 213 S.E.2d at 779 (citing *Deford v. Ballentine Realty Corp.*, 164 Va. 436, 180 S.E. 164 (1935)). The same duty that applies in a

---

[7] The amended complaint asserts Count II against the "Individual Defendants," Am. Compl. ¶¶ 126-32, a term defined to identify only the Directors, *see id.* ¶ 12 (designating the Directors as the "Individual Old A-9 Defendants"). By contrast, when referring to the Managers, the amended complaint either uses the term "Apple REIT Management Defendants" or includes them in the collective "All Defendants." *See* Am. Compl. ¶¶ 15, 133-36. Accordingly, the Court reads Count II as being asserted against only the Directors.

director or officer's dealings with shareholders applies with equal force with respect to their dealings with the corporation itself. *See Rowland v. Kable*, 174 Va. 343, 366, 6 S.E.2d 633, 642 (1940); *see also Byelick v. Vivadelli*, 79 F. Supp. 2d 610, 623 (E.D. Va. 1999) ("It is well settled that a Virginia corporation's directors and officers owe a duty of loyalty both to the corporation and to the corporation's shareholders." (quoting *WLR Foods v. Tyson Foods, Inc.*, 869 F. Supp. 419, 421 (W.D. Va. 1994) (internal quotations and alterations omitted)). The duty of fidelity forbids the director from "placing himself in a position where his individual interest clashes with his duty to his corporation." *Rowland*, 174 Va. at 366, 6 S.E.2d at 642.

DCG&T pled that the plaintiffs were shareholders of A9 and that the Directors were directors of A9. Am. Compl. ¶¶ 4, 7-11. As such, DCG&T has plausibly established that the Directors owed a fiduciary duty to both DCG&T and A9.

With respect to breach, DCG&T states sufficient factual allegations throughout its 37-page amended complaint suggesting a plausible conclusion that the Directors did not act in good faith for the best interests of the A9 shareholders, but rather for the benefit of themselves or others. For instance, DCG&T alleges that the Directors intentionally favored the interests of insiders holding preferred stock to the detriment of common shareholders. Am. Compl. ¶ 117-18. Similarly, the Directors allegedly failed to "fully inform themselves" of the true value of each Apple REIT entity prior to the merger while knowingly relying on financial opinions that were out of date. *Id.* ¶ 122. In a broad sense, the multiple accusations leveled by DCG&T allege in a variety of ways that the Directors knowingly engaged in a flawed and conflicted decision making process leading up to the merger, much to the detriment of A9 shareholders. *See id.* ¶¶ 85-90. The defendants may disagree with those factual allegations, but the Court may not

consider factual disputes at the 12(b)(6) stage. Accordingly, DCG&T has plausibly established that the director defendants breached their fiduciary duties.

The defendants make much of DCG&T's statement that the defendants ought to have "maximized shareholder value." The defendants read this as an allegation that they breached so-called *Revlon* duties, which require directors to "get[ ] the best price for the stockholders at a sale of the company." *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del. 1986). The Supreme Court of Virginia has expressly rejected the holding of *Revlon. See Willard v. Moneta Bldg. Supply, Inc.*, 258 Va. 140, 151, 515 S.E.2d 277, 284 (1999) ("Thus, the *Revlon* test is not applicable in Virginia."). The defendants overstate this argument, however, because, as discussed above, DCG&T alleges facts that indicate a breach of the fiduciary duty of loyalty and care separate from any *Revlon*-style duties.

The defendants also attempt to counter DCG&T's claims of fiduciary breach by seeking cover under Virginia's statutory business judgment rule, Virginia Code § 13.1-690. Under this provision, if a director acts "in accordance with his [or] her good faith business judgment of what is in the best interests of the corporation," then he or she will be shielded from liability. *Willard*, 258 Va. at 142, 515 S.E.2d at 284. Moreover, under Virginia's business judgment rule, directors are entitled to rely on the advice of others as long as the directors have no reason to doubt the reliability of the advice. *See* Va. Code § 13.1-690(B). According to the Directors, their actions were the result of a subjective, good faith belief that the merger was in the best interest of A9. As such, the Directors contend they are immune from liability.

But the Directors' arguments ignore the limitations of a 12(b)(6) motion. At this stage, the Court only tests the sufficiency of the amended complaint. In the amended complaint, DCG&T has pled that the Directors acted in either selfish bad-faith for their own enrichment or

careless disregard for the best interests of the shareholders (or both). Additionally, DCG&T pled that the fairness reports on which the Directors relied were "stale," so the defendants ought to have known that reliance on them was unwarranted. These facts raise a plausible inference that the Directors did not act in good faith. "To the extent that the [Directors] dispute these allegations, such disputes reflect the existence of factual issues that may not be resolved in a Rule 12(b)(6) motion to dismiss." *In re LandAmerica Fin. Grp., Inc.*, 470 B.R. 759, 792 (Bankr. E.D. Va. 2012).

The Directors make a similar immunity argument by pointing to the exculpatory clause in A9's articles of incorporation. In Virginia, corporations may limit or eliminate the liability of their directors and officers by inserting exculpatory clauses into their articles of incorporation. *See* Va. Code § 13.1-691.1(A). The Directors assert that they deserve immunity because A9's articles contained a broad exculpatory clause that eliminated liability to the fullest extent allowed by the Virginia Stock Corporation Act. Defs.' Brief 18. Importantly, however, a director or officer *cannot* receive that protection if the questionable actions were willful misconduct or knowing violations of criminal or securities laws. *See id.* § 13.1-691(B). "An act constitutes 'willful misconduct' if the actor commits an intentional act or omission that is wrongful, regardless whether injury was intended." *In re LandAmerica*, 470 B.R. at 787. Here, DCG&T's factual allegations plausibly state willful misconduct, including that the Directors sought to enrich themselves and disregard the best interests of the corporation. The exculpatory clause may eventually provide a defense, but not one to defeat the complaint at this stage in the case.

Finally, with respect to damages, "a complaint need not plead damages with specificity to survive a Rule 12(b)(6) motion to dismiss." *Id.* at 804 (citing *Koschene v. Hutchinson*, 73 Va. Cir. 103, 106 (2007)). To survive a 12(b)(6) motion, it is enough for the plaintiff to "allege[ ]

facts that would allow it to recover some damages on its breach of fiduciary duty claim." *United States v. Douglas*, 626 F. Supp. 621, 623 (E.D. Va. 1985). As discussed above, DCG&T has plausibly stated the existence of a fiduciary duty and breach of that duty. Moreover, DCG&T alleges the Directors' breach diluted the value of A9 shareholders' investments. Am. Compl. ¶ 117. This is enough for the Court to conclude that DCG&T states a claim for relief in Count II.

Accordingly, the Court DENIES the motion to dismiss with respect to Count II.

### 3. Count IV is Dismissed in Part

In Count IV, DCG&T alleges both a direct class claim and derivative claim under Virginia Code §§ 13.1-691 and -725 in order to rescind the merger of A7, A8, and A9. *Id.* ¶¶ 138-42. Because DCG&T puts forth two separate theories for invalidating the merger— a conflicts of interest transaction and an affiliated transaction—the Court will address each separately.

#### *a. Count IV's Conflict of Interest Transaction Claim Must Be Brought Derivatively*

DCG&T seeks to void the merger of the Apple REIT entities by alleging that the merger was a conflict of interest transaction under Virginia Code § 13.1-691. Section 13.1-691(A) states:

> A conflict of interests transaction is a transaction with the corporation in which a director of the corporation has an interest that precludes the director from being a disinterested director. A conflict of interests transaction is not voidable *by the corporation* solely because of the director's interest in the transaction if any one of the following is true:
>
> > 1. The material facts of the transaction and the director's interest were disclosed or known to the board of directors or a committee of the board of directors and the board of directors or committee authorized, approved, or ratified the transaction;
> >
> > 2. The material facts of the transaction and the director's interest were disclosed to the shareholders entitled to vote and they authorized, approved, or ratified the transaction; or

3. The transaction was fair to the corporation.

Va. Code § 13.1-691(A) (emphasis added). Although § 13.1-691 defines conflicts of interest transactions and provides options to remedy the conflict, a director's liability for engaging in such a transaction "is controlled by § 13.1-690," not Subsection 691. *Byelick*, 79 F. Supp. 2d at 628. In other words, Subsection 691 provides only a mechanism to void the merger, not an avenue to hold directors or officers liable.

DCG&T brings its claim of a conflicted transaction in part as a direct class action, but the plain language of § 13.1-691 "refers to a *corporation's* (and not a shareholder's) right to void an interested director transaction." *Byelick*, 79 F. Supp. 2d at 628. Because the right belongs to the corporation, not the shareholder individually, DCG&T can bring its claim under § 13.1-691 through only a shareholder derivative suit. *Id.* ("[T]he corporation could void an interested director transaction by way of a derivative suit brought on behalf of a shareholder.").[8] Accordingly, the Court GRANTS the motion to dismiss with respect to Count IV's direct class claim brought under § 13.1-691.

### *b. Count IV States a Derivative Claim for a Conflict of Interest Transaction*

DCG&T also brings its conflict of interest transaction claim in Count IV as a derivative claim and seeks to enforce A9's right to void the merger. Specifically, DCG&T argues that all of the Directors, by virtue of their membership on the boards of A7 and A8, could not be disinterested. Under § 13.1-691, the plaintiff has the initial burden to point out the conflict of interest. *See Willard*, 258 Va. at 154, 515 S.E.2d at 286. Once the plaintiff asserts a conflict of interest under § 13.1-691, "the burden shifts to the directors to show that their actions complied

---

[8] Although the Court in *Byelick* found that a shareholder could bring a direct action under § 13.1-691 to void an interested director transaction, that holding was limited to the context of a closely held corporation. *Byelick*, 79 F. Supp. 2d at 628 ("[I]t would seem in Virginia, a shareholder can challenge an interested director transaction *in a close corporation* under § 13.1-691.").

with the requirements of that section." *Izadpanah v. Boeing Joint Venture*, 243 Va. 81, 83, 412 S.E.2d 708, 709 (1992).

DCG&T meets its initial burden of asserting a conflict of interest among the Directors. The fact that each A9 director also sat on the board of either A7 or A8, the entities on the other side of the merger, clearly shows that none could be disinterested in the transaction. The Directors seem to recognize this and therefore focus their arguments on compliance with the remedial provisions of § 13.1-691. They argue that all the material information regarding their conflicted positions and the varying interests of each director were properly presented to the shareholders, who then ratified the transaction. But whether the defendants may assert this defense under the statute involves a question of fact that cannot be resolved on a 12(b)(6) motion to dismiss. *See Republican Party of N.C.*, 980 F.2d at 952 (explaining that a 12(b)(6) motion "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses"); *see also Izadpanah*, 243 Va. at 83, 412 S.E. 2d at 709 ("Whether defendants met their burden of proof cannot be resolved when considering a motion to strike.").

Alternatively, the defendants argue that DCG&T fails to state a claim to undo the merger because Virginia corporate law limits DCG&T's remedies to appraisal rights. Under Virginia Code § 13.1-741.1(A), the legality of a merger cannot be challenged, "enjoined, set aside or rescinded," after it has been approved. But this limitation does not apply if the merger was an interested transaction under §13.1-691. *See* Va. Code §13.1-741.1(B)(2)-(3). As discussed above, DCG&T has plausibly alleged that the merger was an impermissible conflict of interest transaction. Again, although the defendants may disagree with the factual allegations set forth by DCG&T, that dispute is not properly resolved in a 12(b)(6) motion.

Accordingly, the Court DENIES the motion to dismiss with respect to Count IV's derivative claim for a conflicts of interest transaction under § 13.1-691.

### c. Count IV Fails to State a Claim for an Affiliated Transaction

Virginia Code § 13.1-725.1 prohibits corporations from engaging in affiliated transactions with certain shareholders. Va. Code § 13.1-725.1.[9] In the amended complaint, DCG&T alleges "[t]he merger is an affiliated transaction as defined under Section 13.1-725(1), (2), (4), and (6)." Am. Compl. ¶ 141. DCG&T then asserts "[t]he Knights had 'control' pursuant to the definition set forth in Section 13.1-725 and none of the exemptions of Section 13.1-727 apply to the Merger." *Id.* This gaunt allegation is all that DCG&T posits in support of its affiliated transaction claim. Because the allegation lacks sufficient factual support, Count IV fails to state a claim for an affiliated transaction.

At the outset, although DCG&T alleges that the merger amounted to an affiliated transaction as defined by that term's second, fourth, and sixth definition in § 13.1-725, those definitions plainly apply to conflicted share exchanges, dispositions of corporate assets or debts, and sales or dispositions of voting shares, respectively. None of those definitions apply to the transaction giving rise to the claim: a merger. Only the first definition of "affiliated transaction" applies: "[a]ny merger of the corporation . . . with any interested shareholder or with any

---

[9] The full text of the statute reads: "Notwithstanding any provision to the contrary contained in this chapter, except as provided in subsection B of § 13.1-727, no corporation shall engage in any affiliated transaction with any interested shareholder for a period of three years following such interested shareholder's determination date unless approved by the affirmative vote of a majority (but not less than two) of the disinterested directors and by the affirmative vote of the holders of two-thirds of the voting shares other than shares beneficially owned by the interested shareholder. A corporation may engage in an affiliated transaction with an interested shareholder beginning three years after such interested shareholder's determination date, provided such transaction complies with the provisions of § 13.1-726." Va. Code § 13.1-725.1.

corporation that immediately after the merger would be an affiliate of an interested shareholder that was an interested shareholder immediately before the merger." Va. Code. § 13.1-725.

The same section defines "affiliate" as "a person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the person specified." *Id.* "Interested shareholder" is defined as "[t]he beneficial shareholder of more than 10 percent of any class of the outstanding voting shares of the corporation,"[10] or "[a]n affiliate or associate of the corporation" that "at any time within the preceding three years was an interested shareholder of such corporation." *Id.* The "voting shares" identified under § 13.1-725 refer only to "the outstanding share of all classes or series of the corporation entitled to vote generally in the election of directors." *Id.* A9's articles of incorporation indicate that only common shares may vote in the election of directors. *See* Defs.' Brief, Exh. 4 at 4.1.

In short, to show that the merger was an affiliated transaction, DCG&T must plead that: (1) A8 or A7 held at least 10 percent of outstanding A9 common shares; (2) A8 or A7, immediately after the merger with A9, would be either directly or indirectly under the control of a beneficial shareholder who held at least 10 percent of outstanding A9 common shares; or (3) A8 or A7, at the time of the merger, were under the control of a beneficial shareholder of A9 and at some point between 2011 and 2014 held at least 10 percent of outstanding A9 common shares.

DCG&T's amended complaint fails to set forth any of these scenarios. Nowhere does DCG&T assert facts that show A8 or A7 was affiliated with A9 or controlled by an interested shareholder in the manner defined by § 13.1-725, nor can those inferences be drawn from what DCG&T does assert. The amended complaint states simply that the merger was an affiliated

---

[10] This definition excludes "the corporation or any of its subsidiaries, any savings, employee stock ownership, or other employee benefit plan of the corporation or any of its subsidiaries, or any fiduciary with respect to any such plan when acting in such capacity." *Id.*

transaction and that the Knights allegedly "had 'control'" as defined by § 13.1-725. Am. Compl. ¶ 141. These statements fail to amount to even a threadbare recitation of the elements of an affiliated transaction. At best, the allegations are legal conclusions that the Court must ignore. *See Twombly*, 550 U.S. at 555.

Even if the Court looks beyond the amended complaint and scours the nearly 700-page proxy statement for answers, DCG&T's allegations still fall short of asserting an affiliated transaction. First, the materials omit any fact that suggests either A7 or A8 as entities owned any shares of A9, let alone 10 percent of the common shares. Second, the materials show that of the defendants who owned voting shares of A9 at the time of the merger—Glade Knight, Matson, Waters, Wily, Barden, and Justin Knight—none held an amount approaching 10 percent. In fact, their collective ownership of common shares equaled less than 1 percent of the outstanding common shares. Defs.' Brief, Exh. 1, at 218. None of the other defendants held common shares. Third, the materials reveal no information about the ownership of common shares in the three years prior to the merger. The proxy statement bears out none of the scenarios required to show an affiliated transaction.

DCG&T focuses in its briefing on the "control" exerted by the defendants over A7 and A8, but control by itself is insufficient to show an affiliated transaction. DCG&T must show that the controlling party owned 10 percent of A9's common shares. None of the defendants owned 10 percent of A9 common shares, so none of them was an interested shareholder. DCG&T's focus on Glade Knight's ability to control the votes of the A9 directors, thus constituting a beneficial shareholder through indirect voting power, is likewise misguided. None of the A9 directors held, either individually or collectively, more than 1 percent of A9's common shares. Even if Glade Knight did control their votes, therefore, he still controlled less than 10 percent.

In an effort to prove the 10 percent threshold, DCG&T accuses the defendants of misleading the Court by focusing on common share ownership at the time of the proxy statement rather than the time of the merger. Specifically, DCG&T argues that Glade Knight owned more than 10 percent of A9's outstanding voting shares because he converted his 480,000 Series B shares into common shares after the issuance of the proxy statement but immediately prior to the merger. But DCG&T does not show its work. Simple math proves that even counting his Series B shares, each of which converted to 27.17104 common shares, Glade Knight's common share holdings still add up to less than 10 percent of the nearly 400 million outstanding common shares at the time of the merger.

As far as the amended complaint alleges an affiliated transaction under Count IV, that claim lacks factual support. Accordingly, the Court GRANTS the motion to dismiss with respect to the affiliated transaction claim from Count IV.

### d. DCG&T Has Standing to Pursue Its Derivative Claims

In a last ditch effort to derail DCG&T's claims, the defendants argue that DCG&T does not meet the statutory requirements for bringing a derivative suit in Virginia. A plaintiff must meet two prerequisites before bringing a derivative action against a Virginia corporation. First, the plaintiff must have standing to bring the action. To bring a derivative action in Virginia, a plaintiff must (1) be a shareholder of the corporation at the time of the act or omission giving rise to the claim;[11] and (2) "fairly and adequately represent[ ] the interests of the corporation" by bringing the action. Va. Code § 13.1-672.1(A). Second, a plaintiff must make a written demand on the corporation "to take suitable action" and allow 90 days for the corporation to respond. *Id.*

---

[11] A plaintiff can also satisfy this first element if he "[b]ecame a shareholder through transfer by operation of law from one who was a shareholder at the time" or "before public disclosure and without knowledge of the act or omission complained of." Va. Code § 13.1-672.1(A)(2)-(3).

§ 13.1-672.1(B). That waiting period can be avoided, however, if "irreparable injury to the corporation would result by waiting until the end of the 90-day period." *Id.* § 13.1-672.1(B)(2); *Firestone v. Wiley*, 485 F. Supp. 2d 694, 700 (E.D. Va. 2007) (summarizing Va. Code § 13.1-672.1(A) and (B)). The defendants take issue with both DCG&T's standing and the 90-day notice requirement.

First, the defendants claim that DCG&T lacks shareholder standing to bring derivative claims on behalf of A9. The amended complaint says that the plaintiffs "are and have been continuously owners of shares of A-9 common stock of Defendant Apple REIT Nine, Inc.," and discusses the plaintiffs' ownership of A9 stock prior to the merger. Am. Compl. ¶¶ 4-5. The defendants dispute this fact, but the Court cannot resolve this issue on a motion to dismiss.

Second, the defendants contend that DCG&T violated the 90-day notice requirement. DCG&T made a written demand on the Board on December 16, 2013. Thus, under normal circumstances, DCG&T would not be able to bring its derivative claims until March 16, 2014. Instead, DCG&T filed this action on January 31, 2014. Accordingly, DCG&T's action can only survive if waiting until March 16, 2014, would have resulted in "irreparable injury to the corporation." *See* Va. Code § 13.1-672.1(B)(2).

DCG&T's original complaint asked the Court "to cancel the shareholder vote on the merger and/or enjoin the merger." Dk. No. 1, Compl. ¶ 89. The shareholder vote closed on February 27, 2014, more than two weeks before the expiration of the 90-day waiting period. Assuming the truth of DCG&T's allegations, waiting until mid-March to file the suit would have allowed the defendants to successfully perpetrate a fraud on the A9 shareholders. Accordingly, DCG&T did not need to comply with the 90-day waiting period before filing its derivative claims because of the "irreparable injury" exception.

Because DCG&T plausibly states that it was a shareholder at the time of the alleged misconduct by the defendants, still remains a shareholder, and followed the statutory notice requirements, the Court concludes that DCG&T has standing to pursue its derivative claims.

## III. <u>CONCLUSION</u>

In summary, the Court GRANTS the defendants' Motion to Dismiss with respect to Count I, Count III, and Count IV's affiliated transaction and direct conflicted transaction claims. The Court DENIES the defendants' motion with respect to Count II and Count IV's derivative conflicted transaction claim.

Because no class claims remain, the Court DENIES the plaintiffs' Motion to Certify Class as MOOT.

The Court will enter an appropriate order.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

Date: <u>December 18, 2014</u>
Richmond, Virginia

/s/ _____
John A. Gibney, Jr.
United States District Judge